UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ALICE LEE,                        :
                Plaintiff,        :            Pro Se
                                  :
    -against-                     :       04 Civ. 8787 (THK)
                                  :
HEALTHFIRST, INC., a/k/a          : **MEMORANDUM OPINION AND ORDER**
HF MANAGEMENT, INC., a/k/a        :
A PLUS, INC.,                     :
                                  :
                Defendant.        :
----------------------------------X
**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Alice Lee ("Plaintiff"), a fifty-one-year-old Chinese female, originally from Taiwan, brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("the ADEA"), against her former employer HealthFirst, Inc. ("Defendant"). Plaintiff, who was a sales manager for HealthFirst, claims she was subjected to unlawful discrimination because of her age, gender, race, and national origin, both in the individual terms and conditions of her employment, and as a member of a sales team assigned to solicit business in Asian-American communities. Plaintiff also asserts claims under Title VII for a hostile work environment and unlawful retaliation. Defendant has asserted a counterclaim for defamation based on comments allegedly made by Plaintiff about HealthFirst's business practices.

Pending before the Court is Defendant's Motion for Summary Judgment, with respect to all of Plaintiff's claims, pursuant to

Rule 56 of the Federal Rules of Civil Procedure, as well as Plaintiff's Motion for Summary Judgment on Defendant's defamation claim.  For the reasons that follow, the Court concludes that Defendant is entitled to summary judgment and, because all of the federal question claims are to be dismissed, the Court declines to exercise supplemental jurisdiction over Defendant's state law defamation claim.[1]

**FACTUAL BACKGROUND**

Plaintiff's contentions are rambling and, at times, difficult to discern, but are set forth most clearly in the Second Amended Complaint and its attachments.  The Court therefore relies heavily on these documents, while noting that at the summary judgment stage, a plaintiff cannot rely merely on the pleadings, but must provide competent evidence in support of her claims.

I.   <u>Plaintiff's Employment with HealthFirst</u>

Plaintiff is a Chinese female, over the age of forty, whose nationality is Taiwanese. (<u>See</u> Amended Complaint, filed Feb. 28, 2005 ("Am. Compl."), at 3; Defendant's Rule 56.1 Statement of Undisputed Facts, dated Sept. 25, 2006 ("Def.'s 56.1 Stmt."), ¶ 1.) Defendant HealthFirst sells and markets health insurance, including government-funded programs such as Medicaid and Medicare. (<u>See</u> Def.'s 56.1 Stmt. ¶ 2.)

---

[1] The parties consented to proceed before this Court for all purposes, pursuant to 28 U.S.C. § 636(c).

2

Plaintiff was hired by Defendant on July 26, 1999 as a sales representative. (See Def.'s 56.1 Stmt. ¶ 3.)  The job of a sales representative includes signing up new applicants, establishing sales sites, and organizing events to increase enrollment in the various insurance programs.  (See Affidavit of Stephanie Wu in Support of Defendant's Motion for Summary Judgment, dated Sept. 19, 2006 ("Wu Aff."), ¶ 6, attached as Exhibit ("Ex.") 3 to Declaration of Elissa Hutner, Esq., dated Sept. 25, 2006 ("Hutner Decl.").)

In late 2002, Defendant established two bilingual sales teams, under the supervision of Associate Director of Sales Stephanie Wu, to focus on New York City's Asian-American communities.[2] (See Def.'s 56.1 Stmt. ¶ 5; Wu Aff. ¶ 4.) Each team was to have its own manager, and Wu recommended Plaintiff and another sales representative, Mike Lin, for the positions.  (See Def.'s 56.1 Stmt. ¶¶ 5-7; Wu Aff. ¶ 10.)  Lin was promoted first (see Def.'s 56.1 Stmt. ¶ 8; Wu Aff. ¶ 12), and four months later, on April 28, 2003, Plaintiff was promoted (see Wu Aff. ¶ 13).  Plaintiff earned an annual salary of $50,000, and was eligible to participate in a corporate bonus compensation program. (See Def.'s 56.1 Stmt. ¶¶ 8-9.)

---

[2] Sales representatives on these teams, referred to by HealthFirst as the "Asian" or "Interboro" teams, were required to be fluent in English and an Asian language, such as Chinese or Korean.  (See Wu Aff. ¶ 7.)  Many of the sales representatives assigned to the "Asian" teams, including Plaintiff, worked in Asian-American communities prior to the establishment of the new sales teams.  Plaintiff's sales territory was in Chinatown in lower Manhattan.  (See id.)

Plaintiff alleges that shortly after her promotion, she became aware of discrepancies between the terms and conditions of her position and those of the managers of other teams. (<u>See</u> Second Amended Complaint, dated July 28, 2005 ("Second Am. Compl.") ¶ 2.) Specifically, Plaintiff alleges that, unlike other sales representatives, she never received managerial training. (<u>See</u> "Other Bias and Unequal Treatments" ("Other Bias"), attached to Second Am. Comp. at 9.) Plaintiff also alleges that other newly promoted male sales representatives were given the latest model company car and a "standard managerial package" within one week of their promotion, while she never received managerial benefits and was given "a very bad shape and dangerous condition company car – which failed to pass inspection." (<u>See</u> <u>id.</u> at 9-10.)  Whenever Plaintiff approached Wu about these disparities, Wu told her that she would "take care of it." (<u>See</u> Second Am. Comp. ¶ 2.)  Wu never did so, according to Plaintiff, despite "assur[ing] [Plaintiff] that she [would] honor those promises and those benefits." (<u>Id.</u>) Plaintiff also alleges that she was never given a raise on her base salary, even "after almost five years consecutive excellent performance in the company," while others received yearly raises of at least five to seven percent on their base salaries. (<u>See</u> Other Bias at 10.)

Plaintiff further alleges that, beginning in June 2003, her sales team began complaining about its isolation from other teams. (<u>See</u> Second Am. Compl. ¶¶ 3-4.)  Specifically, team members

4

complained about a lack of division-wide meetings and Defendant's failure to provide them with the company's rules and regulations. (See id. ¶ 4; Instances of Discrimination & Unequal Treatments ("Instances of Discrimination"), attached to Second Am. Compl., ¶ 5A.)[3]  The team did not want to be classified as the "Asian" team and "wanted to be actively involved in the company's events and activities." (Second Am. Compl. ¶ 4; see also Instances of Discrimination ¶ 7.)  Plaintiff alleges that the team was prevented from "participat[ing] in any company event[s] while the other teams [were not]." (See Instances of Discrimination ¶ 3.)

Over the course of the summer of 2003, Wu and Plaintiff frequently clashed over Wu's management of the two "Asian" sales teams, and HealthFirst's marketing practices. (See Def.'s 56.1 Stmt. ¶ 15; Second Am. Compl. ¶¶ 3-6.)[4]

The first major conflict occurred on August 17, 2003, when Plaintiff sent an e-mail to Wu stating that she had closed a

---

[3] Under the heading "Instances of Discrimination & Unequal Treatments," there are two paragraphs that are numbered "5."  For convenience, the first of these paragraphs will be identified as "5A" and the second as "5B."

[4] Wu believes Plaintiff took particular issue with Wu's decision to assign members from both "Asian" teams to Chinatown. Wu "felt this was necessary because [Plaintiff's] new team covered territory in Queens, but did not yet have enough sales sites to meet their sales goals.  As a result, [she] assigned half of each team to Chinatown, while the other half was assigned to a borough. [Plaintiff] objected to this strategy in part because she had worked in Chinatown, for a number of years and some of her former sales sites were being covered by the other team."  (Wu Aff. ¶¶ 23-24.)

marketing site at a clinic in Flushing, Queens, without consulting
Wu.  (See Wu Aff. ¶ 18; E-mail from Alice Lee to Stephanie Wu,
dated Aug. 17, 2003, attached as Ex. 2 to Wu Aff.) Wu directed
Plaintiff to reopen the site, and told Plaintiff that she could no
longer contact hospital officials directly.  (See Wu Aff. ¶ 18.)
Defendant claims that despite the directive that Plaintiff not
contact hospitals, in the following weeks she continued to copy
hospital administrators on internal memos she sent to HealthFirst
management. (See Def.'s 56.1 Stmt. ¶ 14; Wu Aff. ¶¶ 19-21.)

On September 16, Plaintiff sent Wu an e-mail, copied to Wu's
supervisor, Vice-President of Sales Gilbert Marchany, complaining
that Wu did not answer her telephone "even though [she was]
available to answer."  (See E-mail from Alice Lee to Stephanie Wu,
dated Sept. 16, 2003, attached as Ex. 5 to Wu Aff.)  Also that day,
Plaintiff sent a two-page memo to Marchany and Wu in which she
outlined several complaints about Wu's management practices,
including "unfair competition in and between the Chinese team[s]"
and a "double standard" in Wu's treatment of the two Asian teams.
(See Memorandum of Alice Lee to Gil Marchany and Stephanie Wu,
dated Sept. 16, 2003, attached as Ex. 6 to Wu Aff.)

The next day, Marchany and Wu met with Plaintiff. (See Second
Am. Compl. ¶ 8.) Plaintiff claims she again raised the issue of the
disparate treatment she and her team had allegedly received. (See
id.)  Plaintiff said she "specifically requested to open proper
communication channels for all company's notice and announcement,

6

and asked not to be isolated from other teams in the company, plus to have routine team and division meetings and to be informed of all company policy and announcements." (Id.)   Plaintiff also brought up the alleged disparate treatment regarding her managerial benefits. (See id.)   According to Plaintiff, Marchany directed Plaintiff "to not communicate directly with him anymore," and said, "I don't care how your team operates, you Chinese know how to deal with your own people."[5]   (Id. ¶ 9; see also Instances of Discrimination ¶ 5B.)   Plaintiff alleges that other teams were afforded direct access to senior company officials and had their grievances and "similar issues rapidly resolved without any problems." (See Other Bias at 11; Instances of Discrimination ¶ 5B.)

On or about September 19, Marchany issued a company-wide request for employees to come forward with any information about improper business practices at HealthFirst. (See Second Am. Compl. ¶ 10.)   Shortly thereafter, Marchany received a telephone call from a member of Plaintiff's sales team, who alleged that there was fraudulent activity occurring at HealthFirst. (See Def.'s 56.1

---

[5] Wu's account of this meeting is somewhat different.  She states that Plaintiff was respectful to Marchany, but addressed Wu "in a loud, rude and disrespectful manner." (See Wu Aff. ¶ 32.) According to Wu, "Gil Marchany told [Plaintiff] that [s]he and her team had to report to their manager and that she had to follow my management decisions and stop causing disagreement in and between the teams.  He told her that she and I had to work things out ourselves and that he would not get involved in the day to day management of the team." (See id. ¶ 33.)

Stmt. ¶ 30.) On September 22, Marchany and George Huge, Director of Outreach Events, met with several members of Plaintiff's sales team, outside of the office, to discuss their concerns about alleged misconduct at HealthFirst, and referred the information they received to HealthFirst's Special Investigations Unit ("SIU"). (See id.; Second Am. Compl. ¶ 11.) Plaintiff alleges that after that meeting, her team members "experienced different levels of harassment by the Defendant . . . ." (Second Am. Compl. ¶ 11.)

On or about September 21, Plaintiff sent a three-page letter to Marchany and Joseph Chasse, Vice-President of Marketing, that contained fifteen examples of alleged "misconduct" at HealthFirst. (See "Classified Letter prepared especially for Gil Marchany and Joe Chase" ("Classified Letter"), attached as Ex. 6 to Hutner Decl.)   In the letter, Plaintiff alleged: (1) that sales representatives were improperly resubmitting client recertification letters to increase enrollments; (2) that Wu had engaged in a conflict of interest by having lunch with a Department of Health auditor; (3) that "someone"[6] had put the "Chinese Team Members" in competition with each other, resulting in a "totally outrageous and extremely unprofessional" situation; (4) that Wu had threatened sales representatives by saying "if you don't make numbers you don't deserve to get paid"; (5) that a sales representative charged a client to fill out a recertification form; (6) that a sales

_____

[6] This is clearly a reference to Wu.

representative "solicits and sells life insurance to clients on behalf" of another company; (7) that Wu called a new sales representative to "harass her just because the newly hired rep did not greet her on the street"; (8) that Wu was improperly collecting referral fees for new hires; (9) that Wu threatened to fire "the entire team" so she could earn new referral fees; (10) that Wu published an incorrect sales site schedule; (11) that Wu forced sales representatives to work in high crime areas and under elevated subway tracks; (12) that Wu brought her dog to work and let it sit in an air conditioned car while sales representatives worked in hot weather; (13) that Wu "forced" sales representatives to not disclose the terms of the insurance application to clients; (14) that Wu did not hold division meetings; and (15) that Wu did not allow employees to "express[] their thoughts and ask questions." (See id.)  Plaintiff concluded the letter by posing the rhetorical question: "Do we really absolutely necessary need to set a position especially for this Director [Wu], or do we have another alternative in our mind?" (See id. at 3.)

While her team was meeting with Marchany and Huge on September 22, Plaintiff was called to a meeting with Wu and Chasse. (See Second Am. Compl. ¶ 12.) At the meeting, Plaintiff once again voiced complaints regarding internal management at HealthFirst and alleged illegal practices.  She contends that she also complained about the alleged disparate treatment she had received with regard

to her promotion. (<u>See</u> <u>id.</u>)[7] Plaintiff alleges that her complaints were not addressed, and that instead, she "was warned not to get involved in any protest activities with the team again . . . ." (<u>See</u> <u>id.</u>)

Over the course of the next several weeks, Plaintiff sent several memos expressing her dissatisfaction with Wu and another HealthFirst manager. (<u>See</u> Memorandum of Alice Lee to Lynda Bedeau, dated Sept. 26, 2003, attached as Ex. 9 to Wu Aff. (claiming that enrollment forms were "removed by Stephanie and disappeared"); Memorandum of Alice Lee to Stephanie Wu, dated Oct. 9, 2003, attached as Ex. 10 to Wu Aff. (challenging Wu's instructions for entering the team's work schedule into a spreadsheet program); E-mail of Alice Lee to Pradeep Kumar, dated Oct. 22, 2003, attached as Ex. 12 to Wu Aff. (accusing Kumar (a sales training coordinator) of making a false accusation that Plaintiff's sales representatives were not working when he conducted a field visit); Memorandum of Alice Lee to Stephanie Wu, undated, attached as Ex. 17 to Wu Aff. (stating that she and her team would not sign a form given to them by Wu unless they "kn[ow] the legitimacy of the matter").) During this period, Plaintiff also contacted HealthFirst's Legal Unit

---

[7] Plaintiff's deposition testimony contradicts this claim. Plaintiff was asked whether, at the meeting with Wu and Chasse, she "discuss[ed] with [Chasse] any of [her] personal complaints about [her] alleged unfair treatment?" Plaintiff responded, "I did not tell him." (<u>See</u> Deposition of Alice Lee, dated Mar. 15 and Mar. 21, 2006 ("Lee Dep."), at 150.)

about her allegations of wrongdoing in the Sales Department. (See Second Am. Compl. ¶¶ 14-17.)

On or about October 17, 2003 SIU completed its investigation into the allegations made in Plaintiff's "Classified Letter" and determined that it was unable to substantiate any complaints of improper sales practices. (See Def.'s 56.1 Stmt. ¶ 38.)[8]  On or about October 24, Plaintiff was called to a meeting with Chief Operating Officer James Boothe, Marchany, and Wu. (See id. ¶ 39.) Boothe told Plaintiff that the SIU investigation had not found any wrongdoing (see id. ¶ 40), that Plaintiff had to work with Wu, not against her (see id. ¶ 42), and "in words or substance" that he did not want to revisit the issues again (see id. ¶ 43). Plaintiff stated that she did not believe the results of the investigation (see id. ¶ 41; Lee Dep. at 160), and interpreted Boothe's remarks as a warning (see Def.'s 56.1 Stmt. ¶ 44; Lee Dep. at 169).[9]

_____

[8] Only three of the fifteen allegations were investigated, including the allegations of charging clients for recertification, selling life insurance, and not properly reviewing applications with potential clients. (See Affirmation of William O'Keefe in Opposition to Plaintiff's Cross-Motion for Summary Judgment, dated Nov. 8, 2006, attached as Ex. 2 to Reply Affirmation in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Cross-motion, dated Oct. 9, 2006 ("Def.'s Reply Aff."), ¶ 4.)  O'Keefe, the manager of SIU, stated that the remaining twelve allegations were determined to be complaints about "Stephanie Wu's management style."  (See id.)

[9] Plaintiff testified at her deposition that she mentioned to Boothe, at the October 24 meeting, that she had not received her bonus check, and that he had promised to look into it. (See Lee Dep. at 163-64).  However, in her Second Amended Complaint, Plaintiff made no mention of discussing the bonus issue with Boothe on October 24, and merely asserted that she did not

On October 23 or 24, Wu spoke to Plaintiff about staffing a sales event that upcoming Sunday, October 26. (See Def.'s 56.1 Stmt. ¶ 45; Lee Dep. at 195-96.)  In a memo to Wu, which was copied to Marchany and others, Plaintiff accused Wu of unprofessional and unreasonable conduct for giving Plaintiff last-minute notice of the October 26 event and failing to provide enough information about the event.  (See Memorandum of Alice Lee to Stephanie Wu, dated Oct. 25, 2003, attached as Ex. 14 to Wu Aff.)  Plaintiff stated in the memo that she and her team would attend the event "if and only if advance notice is given in a reasonable manner." (See id.) HealthFirst staff did not attend the October 26 event.

On October 27, Wu sent a memo to Marchany explaining the issues about the October 26 event.  (See Memorandum of Stephanie Wu to Gil Marchany, dated Oct. 27, 2003, attached as Ex. 15 to Wu Aff.)  Wu wrote that she had acknowledged the late notice to Plaintiff, and told her it was not mandatory that the event be staffed.  Nevertheless, since Plaintiff said she could staff the event, Wu told the event organizers to expect a HealthFirst representative.  (See id.)  However, no HealthFirst representative appeared at the event.

---

receive her bonus check on October 25.  (See Second Am. Compl. ¶ 27.)  Yet, in an October 30 e-mail to Wu inquiring about the bonus, Plaintiff stated that she understood that the bonuses would be distributed by October 30. (See E-mail of Alice Lee to Stephanie Wu, dated Oct. 30, 2003 ("Oct. 30 E-mail"), attached as Ex. 18 to Wu Aff.)

12

On October 30, Wu sent another memo to Marchany and Boothe outlining the problems she had been having with Plaintiff since August. (<u>See</u> Memorandum of Stephanie Wu to Gil Marchany and James Boothe, dated Oct. 30, 2003, attached as Ex. 1 to Wu Aff.)  On the same day, Plaintiff questioned Wu about her quarterly bonus check and warned that if she did not receive the check, she "[would] take necessary action against the company (EEOC)." (Second Am. Compl. ¶ 29.)  Plaintiff also sent Wu an e-mail, copied to Boothe and Marchany, asking about her bonus check.[10] (<u>See</u> Oct. 30 E-mail.)  On November 3, Plaintiff sent a letter to Boothe. (<u>See</u> Second Am. Compl. ¶ 31.)  In the letter, Plaintiff inquired about her bonus check, and said she hoped she was not being retaliated against because of her "good faith report and suggestion to the company." (<u>See</u> <u>id.</u>; Letter of Alice Lee to James Boothe, dated Nov. 3, 2003 ("Nov. 3 Ltr."), attached as Ex. 7 to Hutner Decl.) In the letter, Plaintiff claimed that by reporting to Wu, she had ended up under the "supervision of a communist member from China." (<u>See</u> Nov. 3 Ltr.)

From November 1 to November 7, Plaintiff went out on sick leave.  (<u>See</u> Def.'s 56.1 Stmt. ¶ 62.)  While Plaintiff was on leave, Wu arranged for three days of onsite marketing at the Star Side Drug Store in Flushing, Queens. (<u>See</u> Wu Aff. ¶ 65.)  On

---

[10] The e-mail makes no reference to filing an Equal Employment Opportunity Commission ("EEOC") complaint.  (<u>See</u> Oct. 30 E-mail.)

November 7, Wu assigned Pamela Hong to work at the Star Side sales site. (See id. ¶ 67.) When Hong called Wu from the site to report her attendance, she asked Wu to deliver a marketing table to her. Wu told Hong she would be there in twenty minutes. (See id.) Hong also called Plaintiff to report her attendance at the site. (See Lee Dep. at 205.) Plaintiff told Hong to wait until Plaintiff returned to work and she "would check that out to see what was the problem." (See id.) Plaintiff believed there would be a problem with the table because it would block the building entrance, and did not believe that the store manager could authorize the table. (See id. at 207.) She also believed that since she opened the site, she was responsible for what happened there. (See id. at 210.) Plaintiff also claims that the store's manager called her and discussed the marketing table. (See id. at 209.) Between the time Plaintiff spoke to the manager and the time Wu arrived at the store, the manager decided to cancel the marketing dates. (See Wu Aff. ¶ 72.)

On November 10, at a meeting Plaintiff attended with Marchany, Wu, and Allison Gundel, Manager of the Human Resources Department, Plaintiff's employment was terminated. (See Second Am. Compl. ¶¶ 7, 32). When Plaintiff asked Marchany for the reason for her termination, according to Lee, Marchany answered, "no reason is my reason, because you don't deserve the bonus . . . ." (Id.)[11]

---

[11] According to Defendant, bonuses are not awarded solely on sales performance; general leadership and other criteria are

According to Plaintiff, Marchany continued to mumble other words. When Plaintiff asked him to speak louder, Marchany yelled, "You are wors[e] than my mother, you Chinese old woman.  Now get out of my office . . . . " (Id.)

II.  Post-Termination Activity

   A.   Plaintiff's Employment with CarePlus

   In November 2003, Plaintiff was hired by CarePlus, an insurance company that competes with HealthFirst.  On or about November 20, Wu notified Sean Nataro, Associate General Counsel for HealthFirst, that she believed Plaintiff had been calling HealthFirst employees during business hours and offering them positions with CarePlus.  (See Affirmation of Sean Nataro in Support of Defendant's Motion for Summary Judgment, dated Nov. 8, 2006 ("Nataro Aff."), attached as Ex. 5 to Def.'s Reply Aff., ¶ 2.) Nataro wrote a letter to the President of CarePlus and asked that she look into the matter and ensure that Plaintiff cease contact with HealthFirst employees.  (See id. ¶ 4; Letter of Sean Nataro to Karen Ajmani, dated Nov. 20, 2003, attached as Ex. 6 ("Nataro Ltr.")[12] to Def.'s Reply Aff.)  Nataro stated that his reason for writing the letter was "to protect the business interests of

_____

considered.  (See Def.'s 56.1 Stmt. ¶ 57.)  The decision to withhold Plaintiff's bonus was made by Boothe, on the recommendation of Wu and Marchany.  (See id. ¶ 58.)

   [12] This letter is included in an exhibit of two letters that are attached to Defendant's Reply Affirmation and tabbed as Exhibit 1, although the exhibit is located after Exhibit 5.  For clarity's sake, the Court refers to this exhibit as Exhibit 6.

15

Healthfirst, and not to retaliate against Alice Lee."  (See Nataro Aff. ¶ 5.)

In response to Nataro's letter, CarePlus stated that "we have counseled Ms. Lee about initiating any contact with Healthfirst employees, and have directed her not to call or otherwise contact Healthfirst staff."  (See Letter of Evelyn Huang to Sean Nataro, dated Dec. 3, 2003 ("Huang Ltr."), attached as Ex. 6 to Def.'s Reply Aff.)

B.   EEOC Complaint

On December 29, 2003, Plaintiff filed a complaint with the EEOC against HealthFirst alleging race, sex, age, and national origin discrimination, as well as unlawful retaliation.  (See Am. Compl. at 4.)  After an investigation, the EEOC dismissed Plaintiff's complaint and issued Plaintiff a Right to Sue Letter. (See id. at 5; EEOC Letter of Dismissal and Notice of Rights, dated Aug. 5, 2004, attached to Compl.)

C.   Marchany's Meeting With Plaintiff's Former Sales Team

Plaintiff claims that after HealthFirst terminated her employment, Marchany and Huge learned that other employees wanted to leave the company due to "unfair treatment and ongoing harassment." (See Other Bias at 10.)  Marchany met with Plaintiff's former team members,[13] and allegedly "pointed to each and everyone in a close distance and yelled at them and asked 'You want to go

---

[13] Plaintiff's submissions do not specify exactly when or where this meeting took place.

too? Go now.' When he heard [] no response, he raised his voice and pointed his finger and asked each and everyone at the meeting 'You, Chinese people, don't play with me.  You, you, you stay or go.'" (See id. at 10-11.)  Plaintiff claims that those who attended this meeting were subsequently fired or quit their jobs. (See id. at 11; Second Am. Compl. ¶ 11.)

      D.   <u>Press Conference</u>

     On May 4, 2005, Plaintiff and two other former HealthFirst employees held a press conference that was attended by reporters for local Chinese media.  (<u>See</u> Defendant's Answer and Counterclaim, dated May 22, 2005 ("Def.'s Counterclaim"), ¶ 20.)  Defendant alleges that at the press conference, Plaintiff made "several false and defamatory statements" about HealthFirst.  (<u>See</u> <u>id.</u> ¶ 21.) Defendant contends that "[e]ach of these statements were knowingly false and defamatory, and made for the purpose of impugning HeathFirst's reputation and disparaging HeathFirst's business integrity in the Chinese [c]ommunity."  (<u>Id.</u> ¶ 28)  Articles describing the press conference were published in the "Ming Pao Daily News" and the "Sing Tao Daily."  (<u>See</u> <u>id.</u> ¶ 20; <u>Chinese Employees Accuse HealthFirst of Discrimination</u>, Ming Pao Daily News, May 5, 2005, at A9, attached as Ex. 4 to Def.'s Reply Aff.; <u>Former Employees of HealthFirst Accusing the Employer of Discrimination</u>, Sing Tao Daily, May 5, 2005, at B4, attached as Ex. 4 to Def.'s Reply Aff.)

Plaintiff defends her statements at the press conference, asserting that "the statements made were true and based on [Plaintiff's] knowledge and belief but also was what she personally observed from date one." (See Plaintiff's Reply to Counterclaim, dated Mar. 8, 2006 ("Pl.'s Counterclaim Reply"), ¶ 6.)

## DISCUSSION

### I.   Standard for Summary Judgment

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to put forth "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), or the essential elements of that party's case on which it bears the burden of proof at trial. Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2552). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). The non-moving party may not rest on its

18

pleadings and rely on mere allegations, denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-67, 106 S. Ct. 2505, 2514 (1986); Trinidad v. N.Y. City Dep't of Corr., 423 F. Supp. 2d 151, 161 (S.D.N.Y. 2006). Moreover, "[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial for in doing so he risks the possibility that there will be no trial." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (quoting Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972)).

In deciding a motion for summary judgment, a court may not resolve factual disputes, but merely determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511. A court "must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (citing Anderson, 477 U.S. at 255, 106 S. Ct. at 2513).

When a case is fact-intensive and turns on the intent of one party, as employment discrimination cases often do, "trial courts must be especially chary in handing out summary judgment." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); accord Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir.

19

2000), cert. denied, 530 U.S. 1261, 120 S. Ct. 2718 (2000). The trial court is under a duty in such cases to carefully scrutinize the record for circumstantial evidence that could support an inference of discrimination. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, even in Title VII cases, "conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." Meiri, 759 F.2d at 998; accord During v. City Univ. of New York, No. 01 Civ. 9584 (BSJ), 2005 WL 2276875, at *9 (S.D.N.Y. Sept. 19, 2005); Finney v. Planned Parenthood of N.Y. City, Inc., No. 02 Civ. 7942 (CBM), 2003 WL 22928730, at *4 (S.D.N.Y. Dec. 10, 2003). The "salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases" than to other types of cases. Meiri, 759 F.2d at 998 (further noting that "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases"); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), cert. denied, 534 U.S. 993, 122 S. Ct. 460 (2001); Fair v. Weiburg, No. 02 Civ. 9218 (KMK), 2006 WL 2801999, at *3 (S.D.N.Y. Sept. 28, 2006) ("In particular, a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary

20

judgment.") (internal quotation marks and citation omitted); During, 2005 WL 2276875, at *4, 8-9 (granting summary judgment on discrimination claim where conclusory allegations of plaintiff were the only evidence offered).

II. Plaintiff's Claims

Plaintiff makes myriad claims under Title VII and the ADEA, yet none are supported with competent evidence and, in the end, remain mere accusations. It is clear that Plaintiff disliked Wu, resented being managed by her, and felt that she and her colleagues were not treated well by HealthFirst. However, Plaintiff's case relies on the fallacy that an employee's perception of being treated poorly by an employer is, in and of itself, actionable under federal anti-discrimination laws. As discussed below, this is simply not the case.

A. Title VII and ADEA

Plaintiff claims she was subjected to disparate treatment in the conditions and terms of her employment, in violation of Title VII and the ADEA. Specifically, Plaintiff claims that she was not compensated equitably with other sales representatives, and was not promoted to the position of associate director because of her age. Plaintiff also claims that after being promoted to manager, she was denied training and certain perquisites routinely granted to male managers, "blocked" from communicating with hospital officials and corporate executives, and denied reimbursement for $6,000 in work-related expenses. She further asserts that she and her sales team

were derogatorily classified as the "Asian" team, in reference to their race and/or national origin, prevented from participating in division meetings, and excluded from company events. (See Second Am. Compl. ¶ 8; Other Bias at 9.)

1.   Legal Standards

Under Title VII, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

The ADEA provides that it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C § 623(a)(1).   The ADEA's protection extends to individuals who are forty years of age or older. See 29 U.S.C. § 631.

Analysis of claims under Title VII and ADEA follows the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981).   "'First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.'"   Swierkiewicz v. Sorema N.A., 534 U.S. 506,

510-511, 122 S. Ct. 992, 997 (2002) (quoting <u>Burdine</u>, 450 U.S. at 252-253, 101 S. Ct. at 1093); <u>accord</u> <u>Collins v. N.Y. City Transit Auth.</u>, 305 F.3d 113, 118 (2d Cir. 2002); <u>Scaria v. Rubin</u>, 117 F.3d 652, 653-654 (2d Cir. 1997).  However, the burden of establishing a <u>prima</u> <u>facie</u> case is not an onerous one, "and has frequently been described as minimal." <u>Scaria</u>, 117 F.3d at 654; <u>accord</u> <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 378 (2d Cir. 2003).  To establish a <u>prima</u> <u>facie</u> case of discrimination, the plaintiff must show: 1) that she belonged to a protected class; (2) that she was qualified for the position she held, or that she satisfactorily performed the duties required in her position; (3) that she suffered an adverse employment action;[14] and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. <u>See</u> <u>Feingold</u>, 366 F.3d at 152; <u>Collins</u>, 305 F.3d at 118; <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994).

---

[14] In <u>Williams v. R.H. Donnelly, Corp.</u>, 368 F.3d 123, 128 (2d Cir. 2004), the Second Circuit explained that adverse employment actions include:

> [A] termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.  As these examples suggest, to be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.

<u>Williams</u>, 368 F.3d at 128 (citing <u>Galabya v. N.Y. City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000)).

One way to establish a <u>prima</u> <u>facie</u> case of discrimination is to demonstrate the disparate treatment of other similarly situated employees.[15]  <u>See</u> <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 53-54 (2d Cir. 2001).  Where "a plaintiff seeks to make out her <u>prima</u> <u>facie</u> case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated."  <u>Id.</u> at 53 (citing <u>Shumway v. United Parcel Service, Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997)).   In other words, to support the inference that a plaintiff has been treated differently than another employee because of discrimination, that plaintiff must present evidence that the other employee "ha[s] a situation sufficiently similar to plaintiff's."  <u>Id.</u> at 54.

---

[15] While disparate treatment is "a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the <u>prima</u> <u>facie</u> case," it is not the exclusive means for a plaintiff to meet her initial burden under <u>McDonnell-Douglas</u>. <u>Abdu-Brisson</u>, 239 F.3d at 468. "[T]he inference of discriminatory intent c[an] be drawn in several circumstances including, but not limited to:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

<u>Id.</u> (quoting <u>Chambers</u>, 43 F.3d at 37.)

24

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant, who must then show that "some legitimate, nondiscriminatory reason" exists for the alleged discriminatory actions. McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; see also Feingold, 366 F.3d at 152. The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not discriminatory, since the burden of persuasion remains with the plaintiff throughout the case; the defendant must simply present clear and specific non-discriminatory reasons for its actions. See Burdine, 450 U.S. at 254-58, 101 S. Ct. at 1094-96. If the defendant presents legitimate reasons for its actions, the plaintiff must then be given an opportunity to demonstrate that the defendant's stated reasons are merely a pretext for discrimination. See McDonnell-Douglas, 411 U.S. at 804, 93 S. Ct. at 1825; Burdine, 450 U.S. at 256, 101 S. Ct. at 1095; Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004). "If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" Feingold, 366 F.3d at 152 (quoting Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997)); accord Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 123 (2d Cir. 2004).

2.   <u>Application</u>

There is no dispute that Plaintiff, as a Chinese woman of Taiwainese national origin who is over the age of forty, is a member of several protected classes under Title VII and the AEDA. Moreover, the Court assumes that Plaintiff was qualified to hold the position of manager as she had worked for HealthFirst for more than four years and had been promoted to the position of manager prior to her termination. <u>See</u> <u>Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust</u>, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002) (Plaintiff "need not demonstrate that [her] performance was flawless or superior. Rather, [she] need only demonstrate that [she] possesses the basic skills necessary for the performance of [the] job") (internal citation and quotation omitted); <u>Branson v. Ethan Allen, Inc.</u>, No. 02 Civ. 6588 (JG), 2004 WL 2468610, at *5 (E.D.N.Y. Nov. 3, 2004) ("[T]he fact that the employer has already hired the employee and retained the employee for a significant period of time support[s] the inference that the employee was minimally qualified for the job.") (internal citations omitted). The Court's analysis, therefore, will focus on whether Plaintiff has met her burden on the third and fourth prongs of a <u>prima facie</u> case for discrimination, the first step in the <u>McDonnell-Douglas</u> analysis.

a.   <u>Allegations of Individual Discrimination</u>

<u>Failure to Promote</u>

Plaintiff contends she was discriminated against on account of her age with respect to promotion. (<u>See</u> Instances of Discrimination ¶ 2.)   Plaintiff alleges she had a better background, more experience, and higher seniority than Wu, who was promoted to an associate director position approximately four months before Plaintiff was promoted to Manager.   (<u>See</u> <u>id.</u>)

The failure to promote can be an adverse employment action. <u>See</u> <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 226 (2d Cir. 2004). To assert a <u>prima</u> <u>facie</u> case of a discriminatory failure to promote, a plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she 'applied and was qualified for a job for which the employer was seeking applicants'; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."   <u>See</u> <u>id.</u> (quoting <u>Brown v. Coach Stores, Inc.</u>, 163 F.3d 706, 709 (2d Cir. 1998)).   Plaintiff, however, offers no evidence that she sought and applied for an open position as an associate director at HealthFirst, or that HealthFirst let an associate director position remain open while continuing to seek younger applicants with her qualifications.

Moreover, Plaintiff fails to offer any evidence suggesting that she was not promoted under circumstances giving rise to an inference of discrimination based upon age.   Inasmuch as Plaintiff

27

seeks to demonstrate such an inference by comparing herself with Wu, Plaintiff first must establish that she and Wu were similarly situated, which she fails to do.  Plaintiff has not offered any competent evidence about her own background and qualifications for the position of associate director, and has not submitted any evidence to support her conclusory opinion that she was more qualified and/or experienced than Wu (for example, resumes from Plaintiff and Wu).  See Ani v. IMI Sys., Inc., No. 98 Civ. 8430 (DAB)(MHD), 2002 WL 1888873, at *11 (S.D.N.Y. Aug. 15, 2002) (court reviews resumes of plaintiff and co-workers to determine whether plaintiff's proposed comparators were similarly situated). Plaintiff's personal opinion of Wu's purported lesser qualifications is of no weight.  There is simply no competent evidence from which a jury could reasonably find that Plaintiff was equally or more qualified than Wu for an associate director position.  See Matos v. City of New York Dep't of Homeless Servs., No. 01 Civ. 756 (DC), 2003 WL 169779, at *3 (S.D.N.Y. Jan. 23, 2003) (conclusory claims do not suffice to establish plaintiff was more qualified than other candidates).  Moreover, what little evidence there is in the record about Wu's background suggests that she and Plaintiff were not similarly situated.  Wu held the position of manager at HealthFirst from early 2001 until her promotion to associate director in late 2002/early 2003. (See Wu Aff. at 3.)  Thus, at the time Wu was promoted to associate director, she had been in a position senior to Plaintiff for almost

28

two years.  In short, Plaintiff's failure to make a threshold showing that she and Wu were similarly situated and qualified for the position of associate director defeats any contention that Wu's promotion occurred under circumstances giving rise to an inference of discrimination.

Likewise, there also is no evidence, direct or circumstantial, that Plaintiff was not promoted on account of her age.  The record contains no information about Wu's birth date, so there is no basis to determine the age disparity, if any, between Plaintiff and Wu. In any event, notwithstanding her age, Plaintiff was promoted to the position of manager.

For all of these reasons, Plaintiff fails to establish a <u>prima facie</u> case of age discrimination with respect to promotion.

<u>Failure to Raise Base Salary</u>

Plaintiff alleges that she was never given a raise on her base salary, which she claims Defendant promised, even "after almost five years consecutive excellent performance in the company," while "others" received yearly raises of at least five to seven percent on their base salaries. (<u>See</u> Other Bias and Unequal Treatments, attached to Second Am. Comp., at 10.)  The Court construes this to be a disparate treatment claim under Title VII and the AEDA.

The evidence indicates that Plaintiff received several raises during her employment with HealthFirst.  Plaintiff was hired on July 26, 1999, as a sales representative, at a base salary of $30,000, and received three increases in 2000, culminating in a

salary of $44,750.   (See Authorization to Hire Personnel (Alice
Lee), effective July 26, 1999, attached as Ex. 1A to Affidavit of
Andrea Forino in Support of Defendant's Motion for Summary
Judgment, dated Sept. 21, 2006 ("Forino Aff."), attached as Ex. 4
to Hutner Decl.; Status Change Form (Alice Lee), effective Jan. 1,
2000, attached as Ex. 1B to Forino Aff.; Status Change Form (Alice
Lee), effective Apr. 3, 2000, attached as Ex. 1C to Forino Aff.;
Status Change Form (Alice Lee), effective July 3, 2000, attached as
Ex. 1D to Forino Aff.)   Plaintiff's salary was static until 2003,
when she was promoted to a manager position.   (See Status Change
Form (Alice Lee), effective April 28, 2003, attached as Ex. 1E to
Forino Aff.)   At her deposition, Plaintiff explained that she
received a $5,000 raise in early 2000 because of a corporate salary
scale revision that raised the base salaries of all sales
representatives.  (See Lee Dep. at 170-171.)  She further explained
that the two other raises she received in 2000 were attributable to
a company policy that rewarded sales representatives with a salary
increase of $3,500 if they enrolled thirty-five new members a week
consistently for three months.   (See id. at 172.)   Plaintiff
asserts other employees received "seven percent or four percent"
yearly raises separate from the salary-incentive policy.  (See id.
at 177-78; Other Bias at 10.)

     Plaintiff, however, has provided no evidence that other
employees received automatic yearly raises regardless of their
performance. Plaintiff has not even identified the "others" who

allegedly received the four to seven percent annual raises, their salaries over time, and most significantly, either their ages or national origins.  Thus, a jury would have no basis to conclude that other similarly situated employees received more frequent or substantial raises than Plaintiff.

The only comparative salary information in the record is a spreadsheet that details the race, gender, age, and salary of ten individuals who were promoted to the position of sales manager between January and October 2003, including Plaintiff (see Sales Managers Promotions 1/1/2003-10/31/2003 ("Promotions Spreadsheet"), attached to Memorandum of Law in Support to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, dated Dec. 4, 2006 ("Pl.'s Reply")).

The spreadsheet is at best inconclusive, and, if anything, undermines Plaintiff's claim of disparate treatment in salary. Contrary to Plaintiff's apparent allegation that she did not receive an increase in her base salary upon her 2003 promotion, the spreadsheet indicates that Plaintiff received a salary increase of 11.7 percent, from $44,750 to $50,000 annually, when she was promoted from senior marketing representative to manager.  (See Promotions Spreadsheet.)  Moreover, it appears that Plaintiff's salary upon promotion was in line with the majority of people promoted.  Seven of the other ten individuals promoted to manager, most of whom were male, and/or non-Asian, and/or younger than Plaintiff, received salaries of $50,000 as well.

Only two employees were promoted with base salaries of $55,000, $5,000 higher than Plaintiff's and the other seven people promoted – Lin, an Asian male, sixteen years Plaintiff's junior, and Soledad Murillo, a female Hispanic, five and one-half years Plaintiff's junior.  (See id.)  Plaintiff fails to establish an inference of discrimination through the demonstration of disparate treatment, as she has failed to proffer any evidence that she, Lin, and Murillo were "similarly situated in all material respects." McGuinness, 263 F.3d at 53-54.  Plaintiff has provided no evidence about Lin and Murillo's experience, tenure with HealthFirst, or other relevant qualifications for the position of manager. Moreover, Lin and Murillo's higher salaries fail to support an inference of discrimination on the basis of national origin or gender, as Lin appears to be of Chinese descent and Murillo is a female.[16] In addition, the fact that Lin and Murillo are younger than Plaintiff does not, standing alone, create an inference of discrimination on the basis of age.  Three individuals, including one African-American male younger than Lin, and a Hispanic male and an Asian male younger than Murillo, received the same $50,000 salary as Plaintiff.

In the end, Plaintiff adduces no evidence indicating that she did not receive a higher salary because of her age, gender or

---

[16] Based on the record, it appears that Lin and Murillo received the $55,000 salary, rather than $50,000, because they were earning higher salaries than Plaintiff and the seven other managers prior to their promotion.

national origin.  Therefore, Plaintiff fails to establish a <u>prima</u>
<u>facie</u> case of discrimination with respect to salary increases.

<u>Unequal Access to Training</u>

"It shall be an unlawful employment practice for any employer
. . . controlling apprenticeship or other training or retraining,
including on-the-job training programs, to discriminate against any
individual because of his race, color, religion, sex, or national
origin in admission to, or employment in, any program established
to  provide  apprenticeship  or  other  training."  42  U.S.C.  §
2000e-2(d); <u>see also</u> <u>Fleming v. Verizon New York, Inc.</u>, No. 03 Civ.
5639 (WHP), 2006 WL 2709766, at *13 (S.D.N.Y. Sept. 22, 2006)
("where employee training may result in increased job security or
more overtime hours, the denial of such training may constitute an
adverse employment action") (citing <u>Little v. Nat'l Broad. Co.</u>, 210
F.  Supp.  2d  330,  381  (S.D.N.Y.  2002)).   A  plaintiff  alleging
unequal  access  to  training  must  demonstrate  that  the  employer
offered training to other employees and that plaintiff was denied
that training under circumstances that give rise to an inference of
discrimination.  <u>See</u> <u>Ani</u>, 2002 WL 1888873, at *6 (citing <u>Lopez v.</u>
<u>Metro. Life Ins. Co.</u>, 930 F.2d 157, 161 (2d Cir.), <u>cert. denied</u>,
502 U.S. 880, 112 S. Ct. 228 (1991)).

Plaintiff  fails  to  make  these  critical  showings.   As  an
initial matter, there is no admissible evidence that HealthFirst
provided training for internally promoted employees.  Defendant has
submitted affidavits from HealthFirst executives stating that while

33

it does train <u>new</u> employees, it does not train employees such as
Plaintiff, who worked for the company as a sales representative for
several years before being promoted to a manager position. (<u>See</u>
Forino Aff. ¶¶ 22-24; Affidavit of Lawrence Tejeda, dated Sept. 21,
2006 ("Tejeda Aff."), attached as Ex. 5 to Hutner Decl., ¶¶ 3-6.)
Plaintiff has offered no competent evidence to rebut these
affidavits, and instead makes the bald assertion that Defendant is
simply lying about the existence of the training program. (<u>See</u>
Memorandum of Law in Opposition to Defendant's Motion for Summary
Judgment and in Support of Plaintiff's Cross Motion to Dismiss,
dated Oct. 24, 2006 (Pl.'s Mem.), at 6-7.)[17]   Moreover, Plaintiff
fails to identify other managers who received training that she did
not receive.

    In addition, even if Plaintiff could establish the existence
of a training program which she was denied, it would not suffice to
demonstrate a <u>prima facie</u> case of discrimination; she must show
that she has suffered an adverse employment action that other male,
non-Asian, or younger, managers did not.  Plaintiff has not offered
evidence of the content, duration, and frequency of the alleged
training, or how the deprivation of training disadvantaged her in

_____

    [17] Plaintiff suggests that she has confirmation "by several
former managers" of the existence of such training, (<u>see</u> Pl.'s
Mem. at 7), but no such confirmation was provided to the Court.
Moreover, at her deposition, Plaintiff stated that her only basis
for believing that "every other manager" at HealthFirst had
received training was that Wu had told her so.  (<u>See</u> Lee Dep. at
45-46.)  Further, Plaintiff did not know the identity of anyone
who was promoted from sales representative to manager at
HealthFirst who had received the training. (<u>See</u> <u>id.</u> at 44.)

her job.  Plaintiff's generalized claim that there was a training program and that she suffered harm by being excluded from it, is insufficient to establish a <u>prima facie</u> case of discrimination in training.

<u>Unequal Benefits</u>

Plaintiff next contends that Defendant discriminated against her by not providing her with the "standard managerial package" of a new company car, a modern cell phone, and a promotion announcement.  (<u>See</u> Second Am. Comp. ¶ 8; Other Bias at 9.) Plaintiff asserts that while other managers received a "latest model car" within weeks of their promotion, she was forced to wait three months for a car, and when she did receive one, it was in poor condition.  (<u>See</u> Instances of Discrimination ¶ 4.) Defendant basically concedes that Plaintiff did not receive a new car or cell phone, or a promotion announcement, but maintains that such "inactions by management are not adverse actions within the meaning of [Title VII] and she was not at a 'materially significant disadvantage' by not having them."  (<u>See</u> Def.'s Mem. at 11-12.)

As a threshold matter, there is a dearth of evidence to support Plaintiff's claim of disparate treatment with respect to employment benefits.  Plaintiff has offered no competent evidence of what benefits were extended to other managers at HealthFirst, or even which managers she seeks to compare herself to.  But even accepting <u>arguendo</u> that every other manager received a newer car, a cell phone and a promotional announcement, these facts, in and of

themselves, do not rise to the level of being "sufficiently disadvantageous to constitute an adverse employment action." See Williams, 368 F.3d at 128. Plaintiff has not alleged that her employment was affected in any adverse way by being issued an older model car and cell phone, or by the absence of a job announcement. While Plaintiff felt insulted by the omissions, "[s]uch subjective, personal disappointments do not meet the objective indicia of an adverse employment action." Williams, 368 F.3d at 128 (citing Galabya, 202 F.3d at 640); see also Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (that defendants assigned plaintiff employee "a Jeep to use instead of a Ford" does not rise to the level of an adverse employment action); During v. City Univ. of New York, No. 01 Civ. 9584 (BSJ), 2005 WL 2276875, at *11 (S.D.N.Y. Sept. 19, 2005) (noting that a "mere disparity in working conditions between one work location and another is, as a matter of law, a minor employment action") (internal quotation and citation omitted). Moreover, if all of the other managers received these accouterments, then there would be no basis to allege discriminatory treatment as some of the other managers were female, of Chinese national origin, and of similar age to Plaintiff.

Because Plaintiff has failed to show that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination, she has not demonstrated a prima facie case of discrimination with respect to employment benefits.

<u>Blocked Communications With Hospital Officials</u>

Plaintiff claims she was blocked from communicating with hospital officials in an effort to hinder her ability to successfully fulfill her job responsibilities. (<u>See</u> Instances of Discrimination ¶ 6.)

As an initial matter, Defendant contends that communicating with hospital officials was <u>not</u> a part of Plaintiff's job responsibilities. (<u>See</u> Wu Aff. ¶¶ 13-17; Def.'s 56.1 Stmt. ¶¶ 13-14.) Yet, even assuming that Plaintiff <u>did</u> need to communicate with hospitals, her claim is contradicted by the record evidence. At her deposition, Plaintiff acknowledged that she experienced problems communicating by e-mail with employees at a single hospital. (<u>See</u> Lee Dep. at 48-51.) Plaintiff was, however, able to communicate with the hospital by telefax (<u>see</u> <u>id.</u> at 50), and presumably, by telephone.

Not only were the technical restrictions on Plaintiff's communications apparently limited to a single hospital (and perhaps only a single individual), the evidence also shows that Plaintiff was not the only one affected. Defendant has produced an e-mail from an employee of the hospital at issue that makes clear that HealthFirst's e-mail system was blocking e-mails between the hospital and several employees from HealthFirst, including Plaintiff's supervisors Wu and Marchany. (<u>See</u> E-mail from Marie Lowenhaupt to John Burke, dated Sept. 18, 2003, attached as Ex. 7 to Wu Decl.) In short, no reasonable jury could conclude that

Plaintiff suffered disparate treatment with respect to her ability to communicate with hospital officials; that the limitations arose under circumstances giving rise to an inference of discrimination; or that such interference had a significant impact on Plaintiff's ability to perform her job.

<u>Internal Communications</u>

Plaintiff claims that she was unfairly prohibited from communicating with HealthFirst executives.  (<u>See</u> Other Bias at 9.) This claim appears to stem from Plaintiff's September 18, 2003 meeting with Wu and Marchany.  At this meeting, Plaintiff complained that she and her team were not being properly notified of company policies and announcements, and raised her concerns about the alleged disparities between her compensation and benefits and those of other managers.  Plaintiff also requested that she and her team be supervised directly by Marchany, rather than Wu.[18] Plaintiff claims Marchany told her not to communicate directly with him anymore, and told her she should instead work directly with Wu, adding "I don't care how your team operates, you Chinese know how to deal with your own people . . . [y]ou should deal directly with Stephanie Wu, not me."  (<u>See</u> Am. Comp. ¶¶ 8-9.)[19]

_____

[18] Plaintiff has claimed that "the other team's manager," an apparent reference to Lin, can "communicate with [Marchany] directly without any problem every time they have a problem that need[s] to be resolved."  (<u>See</u> Second Am. Compl. ¶ 9.)

[19] Marchany testified that he told Plaintiff that she should report directly to Wu, but said he has "an open-door policy" whereby "[p]eople can speak to me, or even call me, make an appointment to see me, call me at home."  (<u>See</u> Deposition of

Putting aside, for the moment, the derogatory nature of Marchany's purported statement, Plaintiff's claim – insofar as she is claiming she was denied the opportunity to communicate with HealthFirst management – is contradicted by the record evidence. Plaintiff concedes that after the September 18 conference with Wu and Marchany, she had several meetings with managers at HealthFirst (see Second Am. Compl. ¶¶ 12, 14, 17 (Sept. 23, 2003 meeting with Chasse and Wu; Sept. 25, 2003 meeting with the HealthFirst Legal Unit; Oct. 17, 2003 meeting with the Legal Unit; Oct. 24, 2003 meeting with Boothe and Marchany)), and that she sent numerous letters to management (see id. ¶¶ 13, 15, 16, 18). Whether or not the meetings and correspondence were productive in addressing Plaintiff's concerns, they do clearly undermine any claim that Plaintiff was not permitted any opportunity to communicate with HealthFirst management. Moreover, Wu, her direct supervisor, was part of HealthFirst management and she is the person Marchany told Plaintiff to communicate with, at least in the first instance. That Plaintiff did not want to report to Wu does not establish an adverse employment action. See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006) (change in plaintiff's reporting structure was not an adverse employment action). Finally, Plaintiff has not presented any evidence suggesting that any changes to, or restrictions on, her ability to communicate with upper management, rather than her direct supervisors, amounted to

Gilbert Marchany, dated June 21, 2006 ("Marchany Decl."), attached as Ex. 2 to Hutner Decl., at 27.)

an adverse employment action by interfering with the performance of her job.

In addition, Plaintiff has failed to identify the other managers who she claims had greater access to management, including their ages, gender, and national origin.   There is therefore no basis to conclude that the disparate treatment, if any, arose under circumstances suggesting unlawful discrimination on the basis of age, gender, or national origin.

For all of these reasons, Plaintiff has failed to establish a prima facie case of discrimination on this claim.

Failure to Reimburse Expenses

Plaintiff claims that Defendant "[f]ailed to reimburse . . . around $6,000 outstanding expenses." (Other Bias at 10.)   Some of these expenses were apparently attributable to a "Medicare Chinese [f]lyer" that Plaintiff was working on shortly before her termination (see Second Am. Compl. ¶ 28), as well as money she spent to have her faulty company car inspected and fixed.   (See Other Bias at 9).   It is unclear how much money Plaintiff spent on the flyer and the car repairs, and whether any other expenses are included in the $6,000 figure.

In any event, even assuming that Plaintiff is correct that Defendant has not reimbursed her for $6,000 of expenses, she has offered no evidence suggesting that Defendant refused to do so because of any discriminatory animus.   Plaintiff thus fails to establish a prima facie case of discrimination on this claim.   See

40

Ani, 2002 WL 1888873, at *13 ("[Plaintiff] offers no evidence that [defendant] denied him reimbursement for discriminatory reasons. Thus, plaintiff fails to make his prima facie case on this claim.).

   b.  Allegations of Group Disparate Treatment

   Plaintiff alleges that "Asian" team members were treated differently from other HealthFirst sales teams, and were isolated because of their race and national origin. (See Second Am. Compl. ¶¶ 4, 8.)  Specifically, Plaintiff alleges that her team never had division meetings, while other teams did, and that Defendant failed to provide Plaintiff's team with the company's rules and regulations, which other teams received. (See id. ¶ 4.)  Plaintiff also alleges that her team was excluded from participating in certain company events. (See Instances of Discrimination ¶ 3.)

   As a preliminary matter, the Court notes that this is not a class action and Plaintiff, who is proceeding pro se, is not representing her former team members in this litigation. Therefore, Plaintiff only has standing to pursue her own employment discrimination claims, which have already been addressed. Nevertheless, construing Plaintiff's claims liberally, as is appropriate where a party is proceeding pro se, the Court will address Plaintiff's team-related claims as individual claims on Plaintiff's behalf.

   The Court makes a further observation.  Plaintiff's claims of group discrimination appear to stem primarily from her disagreement with HealthFirst's decision to form the two "Asian" sales teams.

41

(See Lee Dep. at 68-72.)  Yet, while Plaintiff may disagree with a
sales strategy that focuses certain sales teams on specific ethnic
communities, this does not, standing alone, evidence or establish
employment discrimination.[20]  It is not uncommon for companies to
divide up sales territories, and, if fluency in a foreign language,
such as Chinese, is necessary to effectively service a sales
territory, utilizing employees who are fluent in the language is
also not discriminatory.  So long as the division does not result
in unfair treatment of an employee, or group of employees, because
of their protected status, it does not violate Title VII or the
ADEA.  To survive summary judgment, therefore, Plaintiff must
demonstrate that HealthFirst's treatment of her and her team
resulted in an adverse employment action under circumstances giving
rise to an inference of discrimination.

Plaintiff has submitted several affidavits from former
HealthFirst employees, whom she supervised, to support her claims
of group discrimination.  (See Affidavit of James Wong in Support
of Plaintiff's Opposition to Defendant's Motion for Summary
Judgment, dated Oct. 21, 2006 ("Wong Aff."); Affidavit of Chun Kit
Chan in Support of Plaintiff's Opposition to Defendant's Motion for
Summary Judgment, dated Oct. 23, 2006 ("Chan Aff."); Affidavit of
Yin Lung Tung in Support of Plaintiff's Opposition to Defendant's
Motion for Summary Judgment, dated Oct. 20, 2006 ("Tung Aff.");

---

[20] Indeed, there is no evidence that Plaintiff ever sought
to be on another team.

Affidavit of Siu Hei Wu in Support of Plaintiff's Opposition to
Defendant's Motion for Summary Judgment, dated Oct. 19, 2006 ("Siu
Hei Wu Aff.").)[21]   The affidavits, either individually or
collectively, fail to provide the necessary evidentiary support to
allow these claims to survive summary judgment.  For the most part,
the affidavits consist of conclusory allegations that Plaintiff's
team was treated less favorably than other sales teams at
HealthFirst, insofar as working conditions and production demands.[22]
Evidence in opposition to a summary judgment motion must be based
on "concrete particulars," not "conclusory allegations."  Thomas v.
iStar Financial, Inc., 438 F. Supp. 2d 348, 360 (S.D.N.Y. 2006)
(quoting Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir.
1997)); see also Fed. R. Civ. P. 56(e).

> ### Failure to Hold Division Meetings and to Provide Company Rules and Regulations

     Plaintiff testified at her deposition that prior to the 2002-
03 establishment of the two "Asian" sales teams, Marchany and
Chasse held division meetings on a monthly basis to let sales
representatives know about changes in company procedures (e.g.,
filling out expense reports, new application forms). (See Lee Dep.
at 60-62.)  Subsequently, division meetings were called and held by

---

[21] These affidavits are attached as unnumbered exhibits to
Plaintiff's Memorandum of Law in Opposition to Defendant's Motion
for Summary Judgment, dated Oct. 24, 2006.

[22] The affiants appear to believe that the team led by
Plaintiff was treated worse than not only other teams made up of
non-Asians, but also the all-Chinese sales team led by Lin.

43

division leaders who, in Plaintiff's case, was Wu.  (<u>See</u> Marchany
Dep. at 52-53.)   Defendant concedes that prior to Plaintiff's
September 16, 2003 meeting with Marchany and Wu, Wu had not been
holding division meetings.  (<u>See</u> Wu Aff. ¶ 34.)  At the September
16 meeting, Marchany and Wu agreed to hold the meetings (<u>see</u> <u>id.</u>;
Lee Dep. at 100); however, according to Plaintiff, no meetings were
ever held (<u>see</u> Lee Dep. at 66).

Even assuming that the meetings were not held, Plaintiff has
not proffered any evidence that not having the meetings amounted to
an adverse employment action; nor has she demonstrated how Wu's
treatment of her team differed from the way other teams were
treated at HealthFirst.  Plaintiff makes only general allegations
that the meetings were not held and that she and her team did not
receive notification of rule changes and company policies, but she
fails to provide any competent evidence of what information she and
her team did not receive and how they were disadvantaged by not
having the information.  Plaintiff also has not submitted any
evidence even suggesting that a failure to hold division meetings
was the result of a discriminatory motive on the part of Wu, who is
herself Chinese, or HealthFirst.  Thus, Plaintiff has not
established a <u>prima</u> <u>facie</u> claim of discrimination based upon a
failure to hold division meetings and to provide company rules.

<u>Exclusion From a Company Event</u>

Plaintiff claims that she and her team were discriminated
against when they were excluded from attending a single street

fair, which is essentially an opportunity to sell insurance, in a
neighborhood outside of their designated sales territory. (See Lee
Dep. at 67-69.)  Plaintiff offers no specific details about the
date and location of the fair, and who excluded her team from the
fair, nor any explanation as to how she and her team were
disadvantaged by not attending.  Moreover, Plaintiff concedes that
she and her team attended street fairs in their sales territory
that were not attended by other HealthFirst sales teams. (See id.
at 70.) Thus, there is no evidence from which to conclude that the
exclusion from a single sales event was an adverse employment
action.  Moreover, there is no evidence indicating that the "Asian"
team was treated any differently than other sales teams at
HealthFirst, or that their exclusion from the single event occurred
under circumstances giving rise to an inference of discrimination.
Plaintiff thus fails to establish a prima facie claim of
discrimination based upon her team's exclusion from a sales event.

   B.  Hostile Work Environment Under Title VII

   Plaintiff claims she was subjected to a hostile work
environment while employed by HealthFirst.  Plaintiff's complaint
asserts (1) that HealthFirst managers "[u]sed extreme humiliating
and discriminatory remarks towards [Plaintiff] simply because of
her gender and national origin," and (2) that HealthFirst managers
"[u]sed extreme humiliating and discriminatory re[marks] and
physical acts against the employees simply because of their

45

national origin and ethnic[ity]." (<u>See</u> Instances of Discrimination ¶ 11.)

Defendant argues that "the record is bare of any factual evidence to support a finding that Plaintiff was subjected to a workplace 'permeated with discriminatory intimidation' such that it altered the conditions of Plaintiff's employment." (Def.'s Mem. at 15.)

1.   <u>Legal Standards</u>

A plaintiff asserting a hostile work environment claim under Title VII or the ADEA must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys. Inc.</u>, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (internal citation and quotations omitted); <u>accord</u> <u>Demoret</u>, 451 F.3d at 149; <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000); <u>Brennan v. Metro. Opera Ass'n</u>, 192 F.3d 310, 318 (2d Cir. 1999).   Moreover, the plaintiff must demonstrate that the conduct at issue was related to plaintiff's membership in a protected class, <u>see</u> <u>Brennan</u>, 192 F.3d at 318, otherwise it is not actionable under Title VII or the ADEA, <u>see</u> <u>Pronin v. Raffi Custom Photo Lab, Inc.</u>, 383 F. Supp. 2d 628, 634 (S.D.N.Y. 2005).   Federal anti-discrimination statutes are not to serve as "general civility code[s]." <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 81, 118 S. Ct. 998, 1002 (1998).

"The test for determining whether a workplace is a hostile work environment has both subjective and objective elements." Hill v. Rayboy-Brauestein, No. 02 Civ. 3770 (KMK), 2006 WL 3298383, at *13 (S.D.N.Y. Nov. 9, 2006). "The victim must . . . subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 375 (2d Cir. 2002)(citing Harris, 510 U.S. at 21, 114 S. Ct. at 370). As for whether the workplace environment is objectively abusive, the determination of whether a series of actions constitutes a hostile work environment "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22, 114 S. Ct. at 371; accord Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 439 (2d Cir. 1999). "The matter of whether the conduct alleged was so 'severe or pervasive' as to create 'an objectively hostile or abusive work environment, is to be decided based on the totality of the circumstances, in light of such factors as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004) (quoting Harris, 510 U.S. at 23, 114 S. Ct. at 371). Finally, when a dispositive motion is before a court, if "reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of

47

whether a hostile work environment existed may not properly be decided as a matter of law." Id.

    2.  Application

    Assuming that the subjective element of the hostile work environment claim has been satisfied, see Goldschmidt v. N.Y. State Aff. Housing Corp., 380 F. Supp. 2d 303, 312 (S.D.N.Y. 2005) (court assumes "at the outset . . . that the subjective element of the hostile work environment claim has been satisfied, that is, plaintiff perceived his work environment to be hostile and abusive"), Plaintiff must demonstrate that HeathFirst's conduct was so "severe or pervasive" as to create "an objectively hostile or abusive work environment." Harris, 510 U.S. at 21, 114 S. Ct. at 370; accord Patterson, 375 F.3d at 227.

    Plaintiff contends that she was subjected to discriminatory remarks based upon her gender and national origin.  There are two comments in the record, purportedly made by Marchany to Plaintiff, that could arguably support this claim.  The first occurred on September 17, 2003, during a meeting between Marchany and Wu, in which Plaintiff complained about disparate treatment and requested that she no longer report to Wu.  According to Plaintiff, Marchany directed Plaintiff "to not communicate directly with him anymore," and said, "I don't care how your team operates, you Chinese know how to deal with your own people." (See Second Am. Compl. ¶ 9; Instances of Discrimination ¶ 5B.)  The second incident occurred on November 10, 2003, at a meeting with Marchany, Wu, and Gundel,

during which Plaintiff's employment was terminated.  (<u>See</u> Second Am. Compl. ¶ 32.)  At some point, apparently after being asked by Plaintiff not to mumble, Marchany allegedly yelled, "You are wors[e] than my mother, you Chinese old woman.  Now get out of my office . . . . " (<u>Id.</u>)

As an initial matter, the November 10, 2003 remark cannot support a hostile environment claim because Plaintiff had been terminated from employment before Marchany made the comment.  The remark, therefore, could not have adversely altered Plaintiff's working conditions.  Nevertheless, even if the November 10 remark is considered along with the September 17 remark, they are insufficient to demonstrate the existence of hostile workplace environment during the period of Plaintiff's employment with Defendant.

In general, to give rise to a hostile work environment, a defendant's actions must "be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. " <u>Alfano</u>, 294 F.3d at 374 (internal citation and quotation omitted); <u>see also</u> <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 100 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity.") (internal quotation and citation omitted).  In rare instances, a single incident can rise to the level of a hostile work environment, if it is "of sufficient severity . . . so [as to] alter the terms and conditions of

employment as to create such an environment." Patterson, 375 F.3d
at 227 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788,
118 S. Ct. 2275, 2284 (1998)).

Applying these principles to the instant case, the Court
concludes that a reasonable fact finder could not find the alleged
September 17 remark ("You Chinese know how to deal with your own
people"), and the November 10 remark ("You are worse than my
mother, you Chinese old woman"), to have created a hostile work
environment.  There are only two remarks that are alleged to have
been offensive.  Moreover, while the two comments were arguably
boorish and insensitive, they were not physically threatening and
were not made to Plaintiff in the presence of other co-workers; in
addition, Plaintiff offers no evidence indicating that they
unreasonably interfered with her work performance.  When asked at
her deposition about the September 17 comment, Plaintiff stated
only that it gave her "the feeling" of discrimination because she
felt that Marchany would not listen to her complaints because she
was Chinese.  (See Lee Dep. at 92, 94.)  As discussed earlier,
Plaintiff's complaints were with Wu's management of her sales team.
Even if Marchany told Plaintiff in insensitive or derogatory terms,
on a single occasion, that she must report to and work out her
issues with Wu, that would not objectively create a hostile work
environment. See Petrosino, 385 F.3d at 223 ("[i]solated incidents
of offensive conduct (unless extremely serious) will not support a
claim of discriminatory harassment"); Alfano, 294 F.3d at 380 (no

50

cause of action where defendant's actions were "too few, too separate in time, and too mild . . .  to create an abusive working environment"); Augustin v. Yale Club of N.Y. City, No. 03 Civ. 1924 (KMK), 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (four or five comments related to Plaintiff's gender or race over a five-year period too "infrequent and sporadic" to maintain a hostile work environment claim).

Plaintiff seeks to support her claim of a hostile work environment by arguing that other Asian and Asian-American sales representatives were subjected to "humiliating and discriminatory remarks" based upon their race and/or national origin.  Two former colleagues of Plaintiff, Wong and Chan, claim that (1) shortly after Wu was promoted, Wu told them it was company policy that non-Asians were not permitted to transfer into their team, and that members of the "Asian Team" could not transfer to another team (see Wong Aff. ¶ 3; Chan Aff. ¶ 3), and (2) that when they attempted to report to Wu alleged improper business practices by the team led by Lin, they were told not to "because we are Chinese" (see Wong Aff. ¶ 5; Chan Aff. ¶ 5).  Plaintiff also claims that after they met with Marchany and Huge on September 22, her colleagues were "harassed."  In addition, Plaintiff describes a meeting her team was called to by Marchany and Huge after Plaintiff's employment was terminated.  (See Other Bias at 10; Lee Dep. at 222.) Plaintiff alleges that at this meeting Marchany "pointed to each and everyone in a close distance and yelled at them and asked 'You want to go

too? Go now.' When he heard [] no response, he raised his voice and pointed his finger and asked each and everyone at the meeting 'You, Chinese people, don't play with me.  You, you, you stay or go.'" (<u>See</u> Other Bias at 10-11.)

Any racially derogatory comments allegedly made to Plaintiff's team while Plaintiff was still employed by HealthFirst could be relevant to Plaintiff's hostile work environment claim, even if she did not witness the remarks, so long as she was aware of the offensive utterances.  <u>See</u> <u>Schwapp</u>, 118 F.3d at 111; <u>Lichtenstein v. Triarc Co., Inc.</u>, No. 02 Civ. 2626 (JCF), 2004 WL 1087263, at *9 (S.D.N.Y. May 14, 2004). The Court need not determine whether the comments attributed to Wu, who is Chinese – that members of the "Asian" team could not transfer to other teams because they are Chinese, and that they should not complain about Lin's team because they are Chinese – could be considered racially or ethnically derogatory, because there is no evidence in the record that Plaintiff was ever made aware of these comments while she was working at HealthFirst.  Thus, they cannot support her hostile work environment claim.  Moreover, even if these remarks were relevant, they would not demonstrate an objectively hostile work environment.

Similarly, Plaintiff cannot demonstrate a hostile work environment based upon comments allegedly made by Marchany to other employees, after Plaintiff was no longer working at HealthFirst. <u>See</u> <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 71

(2d Cir. 2000) (incidents of harassment are relevant until the employee "actually leaves").

Because no reasonable jury could conclude, on the basis of the two purported remarks made to Plaintiff by Marchany, and two remarks purportedly made to other employees after Plaintiff's employment was terminated, that Plaintiff was subject to ridicule and insult on the basis of her national origin or gender, that was severe and pervasive, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

C.   Retaliation

1.   Legal Standards

Title VII forbids discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the auspices of that statute." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII or the ADEA, a plaintiff must produce sufficient evidence to permit a rational trier of fact to find (1) that she engaged in protected activity under Title VII [or the ADEA],[23] (2) that the

_____

[23] For a plaintiff's conduct to constitute participation in a protected activity, it is enough that she has made "informal protests of discrimination, including making complaints to management . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."  Gregory v. Daly, 243 F.3d 687, 700-01 (2d Cir. 2001) (internal quotations and citations omitted). Construing the evidence in Plaintiff's favor, the Court will assume that, having lodged several informal complaints about

employer was aware of this activity, (3) that the employer took adverse action against the plaintiff,[24] and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. See <u>Kessler v. Westchester County Dep't of Social Servs.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006) (citing <u>Cifra v. General Electric Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)).  Once a plaintiff has made out a <u>prima facie</u> case of retaliation, the burden shifts to the employer to "articulate legitimate non-discriminatory reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." <u>Holt v. KMI-Continental, Inc.</u>, 95 F.3d 123, 130 (2d Cir. 1996).  In the end, "[t]he ultimate burden of persuasion, of course, remains with the plaintiff . . . . The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally . . . retaliated against the plaintiff for engaging in protected activity." <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990).

---

disparate treatment, Plaintiff's verbal threat to file an EEOC complaint constituted protected activity under Title VII.

[24] The Supreme Court recently explained that within the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, __ U.S. __, 126 S. Ct. 2405, 2415 (2006) (internal citation and quotation omitted).

2.   Application

Plaintiff's Prima Facie Case

Plaintiff has satisfied the elements of a prima facie retaliation claim. First, Plaintiff has established that she engaged in protected activity on October 30, 2003 when, in a conversation with Wu, she threatened to file an EEOC complaint. (See Lee Dep. at 201; Second Am. Compl. ¶ 29.) Likewise, Plaintiff has established that less than two weeks after engaging in the protected activity, she was subject to a "materially adverse" employment action when her employment was terminated and she did not receive a bonus check. (See Second Am. Compl. ¶ 32; Instances of Discrimination ¶ 12; Instances of Retaliation, attached to Second Am. Compl. ¶ 5.) Lastly, given the short interval between the protected activity and the adverse employment action, a reasonable trier of fact could find a "causal connection between the protected activity" and the allegedly retaliatory action. See Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (causation may be evidenced by a showing that "the protected activity was followed closely by discriminatory treatment"); Sumner, 899 F.2d 203 at 209 ("the causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment").

HealthFirst's Rebuttal

In rebutting a plaintiff's <u>prima</u> <u>facie</u> case, it is not necessary for a defendant to prove the absence of unlawful motive; the defendant need only set forth a neutral basis for its actions. <u>See Feingold</u>, 366 F.3d at 157; <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 721 (2d Cir. 2002); <u>Ottaviani v. State Univ. of New York</u>, 679 F. Supp. 288, 298 (S.D.N.Y. 1988).

Defendant concedes that the "close proximity in time between Plaintiff's alleged complaints and the adverse actions taken against her would suggest that at the very least she has made a <u>prima</u> <u>facie</u> case of retaliation" (<u>see</u> Def.'s Mem. at 17), but argues that "Plaintiff has chosen to ignore the fact that at the same time she says she was asserting her rights and the rights of her team, management was repeatedly warning her and counseling her about her refusal to accept the supervision of Stephanie Wu and to work as a team with management" (<u>see</u> <u>id.</u> at 17-18). Defendant claims it was justified in withholding Plaintiff's bonus because bonuses are not awarded solely on the basis of sales performance; leadership and other criteria are also considered. Defendant contends that Plaintiff failed to demonstrate appropriate leadership during the bonus period. (<u>See</u> Def.'s 56.1 Stmt. ¶ 57.)

The record amply supports Defendant's contention that Plaintiff repeatedly challenged the authority, qualifications, and wisdom of Wu, and on occasion flatly refused to follow her instructions. Moreover, Plaintiff's decision to shut down

HeathFirst's marketing site at the Star Side Drugstore was clear insubordination. While Plaintiff may have truly believed that the store manager should not have authorized the marketing, her supervisor, Wu, had ultimate responsibility for the decision and Plaintiff clearly undermined her authority.

Plaintiff's insubordination and failure to fulfill her job responsibilities as a sales representative are legitimate justifications for the withholding of her bonus and her discharge. See Meiri, 759 F.2d at 997 (holding that a "profound inability to get along with [] co-workers . . . represents a legitimate, nondiscriminatory reason for an employment decision"); Thermidor v. Beth Israel Medical Ctr., 683 F. Supp. 403, 412 (S.D.N.Y. 1988) (noting that low productivity and conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge); Wilcox v. Runyon, No. 94 Civ. 1921 (SMG), 1995 WL 468270, *4 (E.D.N.Y. July 31, 1995) ("An inability to get along with co-workers is a legitimate, non-discriminatory reason for terminating or disciplining an employee."); Edwards v. Interboro Inst., 840 F. Supp. 222, 230 (E.D.N.Y. 1994) ("[B]latant employee insubordination is a legitimate reason for terminating employment."); Sewell v. N.Y. Transit Auth., 809 F. Supp. 208, 218 (E.D.N.Y. 1992) (holding that insubordination is a legitimate reason for discharge).

Pretext

To satisfy her burden of proof, the plaintiff in a Title VII action must show both that the explanation offered by the defendant is false and that unlawful retaliation was a motivating factor for the employment decision. St. Mary's, 509 U.S. at 519, 113 S. Ct. at 2754; Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 142 (2d Cir. 1993). "It is not enough . . . to disbelieve the employer;" the plaintiff also must come forward with direct or indirect evidence of unlawful retaliation. St. Mary's, 509 U.S. at 511 n. 4, 113 S. Ct. at 2749 n. 4.

In the end, Plaintiff has proffered no evidence that would permit a reasonable fact-finder to conclude that the reasons offered by HealthFirst for discharging Plaintiff from employment – her insubordination and her unwillingness to accept Wu's supervision – were mere pretext for unlawful retaliation because of her passing remark that she would file an EEOC complaint. In fact, Plaintiff does not dispute that she disregarded Wu's instructions and repeatedly challenged her authority. Where an employee has been warned that her job performance is unsatisfactory and she continues the same conduct, she cannot shield herself from legitimate managerial prerogatives by threatening a discrimination complaint and then alleging unlawful retaliation. See Spadola v. N.Y. City Transit Auth., 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003) (Title VII not intended "to arm employees with a tactical coercive weapon that may be turned against the employer as a means for the

asserted victims to advance their own retaliatory motives and strategies, and thereby extract employment concessions on account of minor social lapses or harmless infractions in the workplace, or even to escape appropriate disciplinary measures); see also Ford v. Consolidated Edison Co. of New York, Inc., No. 03 Civ. 9587 (PAC), 2006 WL 538116, at *12 (S.D.N.Y. Mar. 3, 2006) ("Although Plaintiff makes conclusory allegations of pretext, those allegations are completely undermined by the largely undisputed evidence that Plaintiff [failed to perform his job and was insubordinate]."); Mathurin v. Skrivaneck, No. 00 Civ. 1762 (RMB)(MHD), 2003 WL 23744279, at *13 (S.D.N.Y. June 10, 2003) ("[R]egardless of whether plaintiff agrees or disagrees with defendant's assessment of her, and regardless of whether that assessment was justified, the defendant's belief in her inadequacy precludes liability, on the current record, on a claim of impermissible retaliation.")

Defendant is therefore entitled to summary judgment on Plaintiff's retaliation claim.

<u>Post-Employment Retaliation Claims</u>

After being terminated from HealthFirst, Plaintiff began employment with CarePlus, a health insurance company and competitor of HealthFirst. She alleges that CarePlus "receiv[ed] [a] negative referral letter [sic] sent by Defendant" and that this should be considered post-employment retaliation. (See Other Bias at 10; Instances of Discrimination ¶ 6.)

This claim stems from the November 20, 2003, letter from Sean Nataro, Associate General Counsel for HealthFirst, to Karen Ajmani, the CEO of CarePlus.  (See Nataro Ltr.)  In this letter, Nataro stated that Plaintiff "has made over two dozen phone calls to current Healthfirst sales employees . . . to either offer them employment with CarePlus or merely induce them to leave Healthfirst."  (See id.)  Nataro also stated that Plaintiff's employment was "terminated and that her hostile behavior during her termination required that she be escorted from our offices . . . suggest[ing] that her subsequent actions at CarePlus are specifically designed to interfere with Healthfirst operations rather than to meet any legitimate need of her current employer." (See id.)  In response, CarePlus stated that "although we have not concluded that [Plaintiff's] conduct was improper, we have counseled [Plaintiff] about initiating any contact with Healthfirst employees . . . ."  (See Huang Ltr.)

Title VII's protections against employer retaliation extend to former employees.  See Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S. Ct. 843, 849 (1997); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 179 (2d Cir. 2005).  Assuming arguendo that Plaintiff can make out a prima facie case of retaliation, HealthFirst has proffered a legitimate, non-discriminatory reason for writing the November 20 letter, namely its concern with Plaintiff's wholesale recruiting of its staff.  Plaintiff has submitted no evidence to suggest that HealthFirst's reasons for writing the letter were

60

pretextual, and thus, no reasonable jury could conclude that Defendant engaged in unlawful, post-employment retaliation based upon the November 20 letter. Accordingly, Defendant is entitled to summary judgment on this claim.

III. <u>Defendant's Cross-Claim</u>

Defendant has asserted a cross-claim under New York law for slander <u>per</u> <u>se</u> for several statements allegedly made by Plaintiff at a May 4, 2005 press conference "tending to impugn and damage HealthFirst's business integrity by accusing Defendant of engaging in illegal sales practices and employment practices." (<u>See</u> Def.'s Reply Aff. at 4.)

Pursuant to 28 U.S.C. § 1367(a), a federal court has the power to hear state law claims that are closely related to the federal claims asserted. However, supplemental jurisdiction over state law claims is not mandatory, and if all federal claims in a complaint are dismissed before trial, a court may in its discretion dismiss the state law claims as well. <u>See</u> 28 U.S.C. § 1367(c); <u>Tops Markets, Inc. v. Quality Markets, Inc.</u>, 142 F.3d 90, 103 (2d Cir. 1998) (affirming district court's decision to dismiss without prejudice state law claims and counterclaims as proper under 28 U.S.C. § 1367(c)(3)); <u>Scott v. Long Island Sav. Bank, F.S.B.</u>, 937 F.2d 738, 743 (2d Cir. 1991) (compulsory counterclaims may be dismissed where, as here, the initial claim giving rise to federal jurisdiction is dismissed); <u>Pressman v. Neubardt</u>, No. 02 Civ. 8404 (RCC), 2002 WL 31780183, at *4 n. 4 (S.D.N.Y. Dec. 12, 2002)

(same); <u>Nordco, A.S. v. Ledes</u>, No. 95 Civ. 7753 (RJW), 1999 WL 1243883, at *8 (S.D.N.Y. Dec. 21, 1999) (noting that "Section 1367(c)(3) gives district courts discretion to dismiss even compulsory counterclaims where the initial claim giving rise to federal jurisdiction is dismissed.  Where the federal claim is dismissed early in the litigation, the Second Circuit has expressed a strong preference that district courts not exercise ancillary jurisdiction over state law claims.") (internal citations omitted).

Defendant's cross-claim is not closely related to Plaintiff's employment discrimination claims.  The thrust of the cross-claim is that eighteen months after Plaintiff left HealthFirst's employment, she made statements at a press conference alleging illegal business practices at HealthFirst.  In light of this Court's determination that Plaintiff's federal claims are without merit and will be dismissed, this Court finds that supplemental jurisdiction should not be exercised over Defendant's state law cross-claim.  Indeed, "[c]ourts routinely dismiss state defamation, libel, and slander claims for want of subject matter jurisdiction once the underlying federal cause of action is no longer alive." <u>Stewart v. Concourse House HFDC</u>, No. 92 Civ. 4991 (LBS), 1995 WL 653373, *5 (S.D.N.Y. Nov. 7, 1995); <u>see also</u> <u>Abrams v. Carrier Corp.</u>, 434 F.2d 1234, 1254 (2d Cir. 1970) (holding that having dismissed all federal claims, federal court's refusal to exercise pendent jurisdiction over charges of malicious libel and slander, as well as any other causes of action cognizable under state law, was warranted).

Accordingly Defendant's defamation cross-claim is dismissed without prejudice to refiling in state court.

## CONCLUSION

For the reasons stated above, this Court grants Defendant's motion for summary judgment and dismisses with prejudice Plaintiff's claims against HealthFirst under Title VII and the AEDA. The Court also dismisses without prejudice Defendant's defamation claim, for lack of subject matter jurisdiction.

The Clerk shall enter judgment for the Defendant.

SO ORDERED.

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: March 1, 2007
       New York, New York

Copies mailed to:
Alice Lee
P.O.Box 173
Flushing, New York 11358

Elissa Hutner, Esq.
201 West 85th Street, 8th Floor
New York, New York 10024

63